**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **VINCENT FOREMAN,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 3:21-CV-03042-N-BH** |
| | § | |
| **KILOLO KIJAKAZI,** | § | |
| **ACTING COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

Based on the relevant filings, evidence, and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act) should be **AFFIRMED**.

## I.    BACKGROUND

Vincent Foreman (Plaintiff) filed his applications for DIB on June 29, 2011, alleging disability beginning October 1, 2007. (doc. 14-1 at 65-66.)[2] His claims were denied initially on September 6, 2011, and upon reconsideration on December 12, 2011. (*Id.*) After requesting a hearing before an Administrative Law Judge (ALJ) on October 14, 2018, he appeared at a telephonic hearing on January 21, 2021, but he sought and received a postponement of the hearing so he could obtain legal representation. (*Id.* at 58-64.) He appeared and testified at a second telephonic hearing on April 29, 2021. (*Id.* at 36-54.) On May 25, 2021, the ALJ found that Plaintiff

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

had not been disabled from his alleged onset date of October 1, 2007, through the date of his decision. (*Id.* at 15-22.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on May 28, 2021, (*id.* at 5), and he submitted additional evidence on June 24, 2021, (*id.* at 32). Finding that the additional evidence "d[id] not show a reasonable probability that it would change the outcome of the decision", the Appeals Council denied his request for review on September 9, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-7.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 3.)

## A. **Age, Education, and Work Experience**

Plaintiff was born on April 25, 1960; he was 61 at the time of the hearing. (doc. 14-1 at 41, 169.) He had a high school education, could communicate in English, and had no past relevant work. (*Id.* at 41-42, 192.)

## B. **Medical Evidence**[3]

In 1981 and 1982, Plaintiff injured his right knee and underwent surgery, including bilateral collateral ligament repairs. (*Id.* at 258, 272-73.)

On September 29, 2007, Plaintiff presented to the Veterans Affairs North Texas Healthcare Center (VA). (*Id.* at 261.) He weighed 217 pounds, and his BMI was 35. (*Id.* at 262.) His past surgeries included "right knee "ortho[pedic] surgery". (*Id.* at 261.) Although he reported no injury, he complained of foot pain that came and went, and he had a slightly enlarged left first metacarpophalangeal joint.[4] (*Id.* at 261-62.) He had no focal deficits; his extremities had normal

---

[3] Plaintiff's issues focus on his alleged physical limitations due to his knee injury. (doc. 19 at 2-3.) Medical evidence relating to any other medical conditions during the relevant time are therefore not summarized here.

[4] The first metatarsophalangeal joint at the base of the big toe. *First Toe (Metatarsophalangeal) Arthritis*, Columbia University Irving Medical Center, www.columbiaortho.org/patient-care/specialties/foot-and-ankle/conditions-treatments/first-toe-arthritis (last visited Jan. 21, 2023).

muscle strength and no edema, clubbing, or cyanosis. (*Id.*) A physical examination and imaging were ordered, and he was given a 6-month follow-up. (*Id.* at 261, 263.) The note was signed by Guang S. Liu, PA-C, and "acknowledged" by Lina Ahmad Ghory, M.D. (Internist). (*Id.* at 264.)

On October 29, 2007, Plaintiff presented to the VA for a 90-minute physical examination by Family Nurse Practitioner Broc E. Sanchez (FNP). (*Id.* at 253-61.) He weighed 226.5 pounds, was 66 inches tall, and had a BMI of 37. (*Id.* at 254.) His extremities had no cyanosis or clubbing. (*Id.* at 255.) He reported no back problems, rated his pain at zero, and was observed in no acute physical distress. (*Id.*) His "knee condition" was 20 percent "service connected"[5]. (*Id.*) He had a straight posture without scoliosis, symmetric muscles and extremities, appropriate and equal bilaterally 5/5 strength in all extremities, active range of motion without pain or limitation in all joints, normal coordination and gait, and an "old" fracture in his left pinky finger. (*Id.*)

FNP opined that Plaintiff could frequently lift/carry no more than 50 pounds, occasionally lift "50 pounds or more", stand/walk for "6-8 hours/day", and sit for "2 hours/day at a time"; frequently reach, push/pull, and use fine manipulation and foot controls; occasionally twist his back, crawl, kneel, crouch, bend/stoop, and climb, including stairs, ladder, and scaffolds; and have occasional exposure to unprotected heights, moving machinery, temperature extremes, wet or humid areas, noise or vibrations, outdoor activities, and pulmonary irritants. (*Id.* at 256-58.) He checked a box on the medical record indicating that Plaintiff did not require "light duty". (*Id.* at 258.) He diagnosed Plaintiff with "stable" right knee surgery and ankle joint pain, noted that his medications included 400 milligrams of etodolac[6] twice a day as needed for pain, and found that

---

[5] "Disability compensation is a monetary benefit paid to Veterans who are determined by [the] VA to be disabled by an injury or illness that was incurred or aggravated during active military service. These disabilities are considered to be service connected." *Disability Compensation*, VA.gov, www.va.gov/opa/publications/benefits_book/benefits_chap02.asp#:~:text=Disability%20compensation%20is%20a%20monetary,considered%20to%20be%20service%20connected (last visited Jan. 13, 2023).

[6] "Etodolac is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain, and

3

his prognosis was "good". (*Id.* at 259.)

On October 31, 2007, Plaintiff presented to the VA for a "compensation & pension" (C&P) examination[7] with Don Roth, M.D. (Examiner), due to "[i]ncreased service-connection" disabilities and complaints of swelling, pain, and limited motion. (*Id.* at 272-74.) Examiner opined that the conditions affected his activities of daily living because "weight-bearing activities were painful". (*Id.*) He noted that Plaintiff did not wear a brace or use an assistive device and had no prosthesis implant in his right knee. (*Id.*) He also noted Plaintiff's service-related bilateral collateral ligament repair surgery, which was followed by another surgery to correct the limited range of motion that resulted from the first surgery. (*Id.*) He opined that:

> [Plaintiff] [s]how[ed] a limping gait on the right. Range of motion reveal[ed] 0 to 90 degrees with pain throughout. He ha[d] medial jointline tenderness and synovitis. He ha[d] a minimal effusion[8]. He ha[d] no instability to varus or valgus stress but he d[id] have a mildly positive Lachman's[9]. His scars [we]re medially, curvilinear and laterally linear. They [we]re slightly tender laterally and exquisitely tender in the medial scar. The only additional limitation following repetitive use [wa]s increased pain. There [we]re no flare-ups. There [wa]s no effect of incoordination, fatigue, weakness or lack of endurance on his knee function.

(*Id.* at 273.) The same day, Plaintiff had knee x-rays, which were interpreted by John E. Griffin (Radiologist) as follows:

Evidence of previous cruciate ligament repair. A metallic staple is present in respect to the

---

helps to relieve symptoms of arthritis ([e.g.], osteoarthritis and rheumatoid arthritis), including inflammation, swelling, stiffness, and joint pain." *Etodolac (Oral Route)*, MayoClinic.org, www.mayoclinic.org/drugs-supplements/etodolac-oral-route/description/drg-20069756 (last visited Jan. 13, 2023).

[7] The C&P exam is part of a review process for compensation or pension claims and helps the VA determine if a disability is service connected, the level of the disability, or if the condition should receive an increased rating due to it worsening. *Your VA Claim Exam Fact Sheet*, U.S. Dep't of Vet. Affairs 1, Benefits.VA.gov (Jan. 2021), www.benefits.va.gov/COMPENSATION/docs/Claims_Exam_Factsheet_Final_Approved.pdf.

[8] Effusion is defined as "[t]he escape of fluid from the blood vessels or lymphatics into the tissues or a cavity" or "[a] collection of the fluid effused." *Effusion*, Stedmans Medical Dictionary (2014).

[9] *See Lachman test*, Stedmans Medical Dictionary (2014) (a maneuver to detect deficiency of the anterior cruciate ligament (ACL)).

> medial femoral condyle and there are small nodular fragments of bone in respect to this along the medial condyle. Chondrocalcinosis[10]. Minimal to moderate tricompartmental degenerative joint disease. Minimal to moderate narrowing of the medial joint compartment. Small effusion in the knee joint.

(*Id.* at 272-73.) He noted "status post" collateral ligament repairs for an injury. (*Id.* at 272.) Based on these findings and his own examination, Examiner diagnosed Plaintiff with degenerative joint disease in the right knee and chondrocalcinosis. (*Id.* at 274.)

On November 5, 2008, Plaintiff submitted to a "joint evaluation" by Jethro B. Rochelle, M.D. (Joint Doctor). (*Id.* at 272.) Plaintiff reported that his 7/10 knee pain increased to 10/10 on activity, including standing for 45 minutes, walking one mile, climbing stairs, and driving over one hour. (*Id.*) He had worn a knee brace for a year and was not employed. (*Id.*) His physical examination showed a "well healed" 22-centimeter scar on the medial aspect of the right knee, a 6-centimeter scar lateral to the knee, range of motion from 0 to 100 degrees with pain ending at 115 degrees, and tenderness all the way around the knee, but no fluid, crepitus, or laxity. (*Id.*) Joint Doctor diagnosed him with "degenerative joint disease of the right knee with status post ACL repair in 1981 and 1982, with knee pain and severe disability with progression". (*Id.*) He opined that Plaintiff had no additional limitations with flare-up or "repetitive use x3".[11] (*Id.*)

On August 24, 2009, Plaintiff presented to Internist for a follow-up health maintenance visit. (*Id.* at 308.) He reported an upper arm torn muscle from the prior year and asked if it could be repaired, although he had no symptoms of pain or weakness; no magnetic resonance imaging (MRI) was taken at the time. (*Id.*) He weighed 226 pounds, was 65 inches tall, and had a BMI of 38. (*Id.* at 309.) His extremities had no edema, his left upper arm had "normal strength", and his

---

[10] *Chondrocalcinosis*, Stedmans Medical Dictionary (2014) (defining it as "calcification of cartilage").

[11] Plaintiff's date of last insured is December 31, 2008. (doc. 14-1 at 208.)

pain was zero. (*Id.*) He was diagnosed with right knee ligament reconstructions with degenerative joint disease and prescribed aquatic therapy and etodolac as needed. (*Id.*) His Morse fall risk assessment was 0 out of 50 due to a normal gait, orientation to his own abilities, and no ambulatory aid, secondary diagnosis, or intravenous therapy. (*Id.* at 310-11.) He received an orthopedic referral "for any further recommendations." (*Id.* at 309.) The next day, surgeon Michael G. Browne, M.D. (Surgeon), signed a medical note stating in its entirety:

> Chronic long head of biceps proximal rupture is rarely associated with pain or noticeable loss of function. I do not see an indication for surgical tenodesis[12] in this p[atien]t, and there is the remote possibility that surgery will cause chronic pain.

(*Id.* at 308.)

Between August 5, 2009 and September 11, 2009, Plaintiff attended aquatic therapy twelve times and was diagnosed with osteoarthrosis, unspecified. (*Id.* at 270-72.) His disabilities were rated at "less than 50%" service connected. (*Id.*)

On September 10, 2009, Plaintiff presented to the VA for an orthopedic surgery consultation with orthopedist Hilton P Gottschalk, M.D. (Orthopedist), who noted that Plaintiff had undergone surgery after sustaining a knee injury in the 1980s but did not recall its specific nature. (*Id.* at 271, 307.) He also noted that Plaintiff enjoyed some "symptom free" years with his knee but had recently had a lot of pain that he described as "bone on bone". (*Id.*) He noted that Plaintiff ambulated without a cane or assistive device but did wear a "fairly new" knee brace. (*Id.*) Plaintiff had not had "much conservative treatment", such as physical therapy or injections. (*Id.*) A physical examination revealed a medial incision directly over his medial collateral ligament, a

---

[12] Tenodesis is "[s]tabilizing a joint by anchoring the tendons that move that joint, thereby preventing any further excursion of the tendons." *Tenodesis*, Stedmans Medical Dictionary (2014); *see also Biceps Tenodesis*, MyClevelandClinic.org, my.clevelandclinic.org/health/treatments/21926-biceps-tenodesis (last visited Jan. 19, 2023) ("Biceps tenodesis treats biceps tendon tears caused by injury or overuse.").

prominent screw in that area, and tenderness to palpation in the medial area, but his range "seem[ed] to be" 0 to 105 degrees of flexion. (*Id.*) Imaging revealed diffuse sclerosis most prominent in the medial compartment where his joint space was almost obliterated, and he had a staple that "seem[ed] to be" holding a prior attempt to repair his medial collateral ligament. (*Id.*) He concluded that the trauma "seem[ed]" to have progressed into a Pell[e]grini-Stieda[13] lesion. (*Id.*) Orthopedist assessed him with right knee degenerative joint disease, and finding "no complications" with right knee Synvisc[14] injections, he ordered conservative treatment "for now". (*Id.*) He diagnosed Plaintiff with osteoarthrosis, unspecified, and discharged him from the orthopedic clinic, but noted he could get a referral in 6 months if there was no improvement. (*Id.* at 271, 307.)

On September 24, 2009, Plaintiff visited Donald Sally, PA-C (Physician Assistant), at the VA for a follow-up orthopedic visit. (*Id.*) Plaintiff weighed 225.5 pounds, was 65 inches tall, and rated his pain at a level 9. (*Id.*) His "immediate" complaint was a torn muscle in his left upper arm. (*Id.*) He was unsure why he was called for an appointment but acknowledged that he had a "biceps tendon rupture" in his remote past. (*Id.*) He presented with no weakness or pain, "voiced" no other complaints, and was advised that no surgical intervention was required. (*Id.*) Physician Assistant indicated that he would order an orthopedics discharge because Plaintiff could request a consultation in the future "if his condition change[d]". (*Id.*)

On November 17, 2009, Plaintiff presented to the VA for a preventative health screening.

---

[13] Pellegrini disease, or Pellegrini-Stieda disease, is "a calcific density in the medial collateral ligament and/or bony growth on the medial aspect of the medial condyle of the femur". *Pellegrini disease*, Stedmans Medical Dictionary (2014); *see Tigner v. Gardner*, 356 F.2d 647, 649 n.2 (5th Cir. 1966)

[14] "Synvisc-One is indicated for the treatment of pain in osteoarthritis (OA) of the knee in patients who have failed to respond adequately to conservative non-pharmacologic therapy and simple analgesics[,] e.g., acetaminophen." FDA, *Summary of Safety and Effectiveness Data (SSED)* 1, www.accessdata.fda.gov/cdrh_docs/pdf/p940015s012b.pdf (last visited Jan. 19, 2023).

(*Id.* at 303.) He weighed 225 pounds, was 65 inches tall, rated his "primary" pain at 0, reported no complaints, and was medication compliant. (*Id.*) He had a Morse fall risk assessment of 0 out of 50, based on a normal gait, orientation to his own abilities, and no ambulatory aid, secondary diagnosis, or intravenous therapy. (*Id.* at 304.)

The same day, Plaintiff presented to Internist for a follow up health maintenance visit. (*Id.* at 301.) He denied any acute complaints, and his extremities had no edema. (*Id.* at 301-02.) His Tramadol prescription was continued. (*Id.* at 302.) He was diagnosed with right knee ligament reconstruction with degenerative joint disease and prescribed etodolac and aquatic therapy as needed. (*Id.*) Internist noted that his symptoms improved after Synvisc injections and gave him a 5-month follow up. (*Id.* at 302-03.)

On July 16, 2010, Plaintiff presented to the VA for a prescription renewal visit. (*Id.* at 291.) He reported his right knee pain was 8 out of 10; it had been present for more than a year, was always present, increased with exercise, movement, standing/walking, and was relieved by medication and rest. (*Id.*) He was counseled on a weight management program, but he declined it. (*Id.* at 292.)

On October 29, 2010, Plaintiff presented to Internist for a "health maintenance" follow-up. (*Id.* at 284-85.) He reported no acute complaints. (*Id.* at 284.) His medical history included left Achilles tendon surgical repair, left hand small finger fracture, and foot pain. (*Id.*) He was medication compliant, including with Tramadol. (*Id.*) He weighed 230.2 pounds, was 65 inches tall, and had no edema on his extremities. (*Id.* at 285.) He denied any pain or taking any pain medication within the previous 24 hours, and he reported he had started exercising and "watching his diet". (*Id.* at 285-86.) Internist found that he had right knee ligament reconstructions with degenerative joint disease, was taking etodolac, attended aquatic therapy as needed, and had

improvement in symptoms after Synvisc injections. (*Id.* at 285.)

On March 31, 2011, Plaintiff presented to Internist for a "health maintenance" follow-up. (*Id.* at 267, 278-79.) He denied any acute complaints. (*Id.* at 278.) His past history included left Achilles tendon surgical repair, left hand small finger fracture with contracture, and foot pain. (*Id.* at 279.) He weighed 229.8 pounds, was 65 inches tall, had no edema in the extremities, and denied any pain. (*Id.*) Internist diagnosed him with obesity and right knee ligament reconstruction with degenerative joint disease, and she found that his symptoms were stable after Synvisc injections. (*Id.* at 267, 279.) She continued his prescription for Tramadol, and per his request, she referred him to aquatics therapy to lose weight. (*Id.* at 279-80.) The next day, on April 1, 2011, Plaintiff attended an aquatics therapy session and was diagnosed with obesity, unspecified. (*Id.* at 268-69.)

On June 12, 2011, Plaintiff presented to the recreational therapy aquatic therapy clinic. (*Id.* at 276-77.) He was assessed with arthritis, obesity, glaucoma, and Achilles repair. (*Id.* at 276.) He presented with decreased range of motion/flexibility, strength/endurance, functional activity/mobility, gait/transfer/balance, and pain/muscle spasms, poor posture/body mechanics, physical de-conditioning, and obesity. (*Id.*) Goals were set to increase range of motion/strength/endurance and activity level through increased exercise, encourage weight reduction through exercise, re-condition through stretches and exercises, improve balance/transfer/gait through water exercises, and improve cardio fitness and improve/maintain body posture and mechanics. (*Id.*) He was prescribed Tramadol every 8 hours as needed for pain. (*Id.* at 278.) The note was signed by Internist. (*Id.*)

Between June 13, 2011, through July 29, 2011, Plaintiff attended ten 60-minute arthritis aquatic therapy sessions with Donna Earnest (Recreation Therapist). (*Id.* at 268-69, 275-76.) He was diagnosed with osteoarthritis. (*Id.* at 268-89.) In the recreational therapy discharge note dated

July 29, 2011, Recreation Therapist found that Plaintiff had participated in arthritis aquatic therapy and had met the following goals: increase range of motion/strength/endurance, increase activity level and encourage weight reduction through exercise, and re-conditioning through stretches and exercises. (*Id.* at 275.) She noted that he was able to participate "without assistance" and recommended that he continue the exercise program independently. (*Id.*)

On July 21, 2011, Plaintiff submitted to a face-to-face interview with G. Hass (Interviewer Haas), who found Plaintiff had no difficulties with his ability to hear, read, breathe, understand, be coherent, concentrate, talk, answer, sit, stand, see, use his hands, and write, but he did have difficulties in walking and walked "with a very slight limp". (*Id.* at 189-91.)

On August 4, 2011, Plaintiff presented to the VA's emergency room (ER) complaining of his left little finger, which was swollen, tender, and had a deformity from an old fracture while he was in the service. (*Id.* at 274.) He was "ambulatory", weighed 229.8 pounds, was 65 inches tall, and reported no pain. (*Id.*)

On August 10, 2011, Plaintiff completed a Form SSA-3368 disability report, alleging disability due to "right knee problems", glaucoma, and sleep apnea. (*Id.* at 192-93.) He indicated he was receiving primary care "mainly" for his knee, wore a knee brace, and was prescribed medication and therapy. (*Id.* at 196.) Although he denied pain or symptoms from these conditions in one section of the form, he also wrote in a different section that his knee was "deteriorate[ing]", it kept him from performing his work duties, he was "waiting" to have a knee replacement, he had no cartilage in his knee, and his bones "rub[bing]" together caused him pain. (*Id.* at 193, 199.)

On August 31, 2011, state agency medical consultant (SAMC) Patty Rowley, M.D., completed a one-page Case Assessment Form. (*Id.* at 265.) She noted that Plaintiff alleged disability based on "right knee problems", glaucoma, and sleep apnea with an alleged onset date

of October 1, 2007, and opined that he had the medically determinable impairment of degenerative joint disease. (*Id.*) He presented with a limping gait on the right, minimal effusion, slightly tender knee, and medial jointline tenderness and synovitis, and he had been diagnosed with degenerative disc disease on October 31, 2007. (*Id.*) She checked a box on the form marked "Technical Denial" and concluded that there was insufficient evidence to establish disability prior to the date last insured. (*Id.*) Her form did not offer a function-by-function analysis.

On November 8, 2011, Plaintiff completed a Form SSA-3441 disability appeal report, alleging that his knee did not get better but rather "worsen[ed]" every day, and his little finger had "poor circulation". (*Id.* at 211.) He did his "best" with taking care of his personal needs, dealt with pain "every day", was prescribed Tramadol for pain, and had "adjusted" his daily activities due to pain. (*Id.* at 213.) He had not received treatment for or testing of his conditions. (*Id.* at 212.) Although he reported in one section of the form that he had no upcoming treatment or testing scheduled, he wrote in a different section of the form that he continued to wear a knee brace, had a disfigured and swollen pinky finger with poor circulation, and was scheduled for an appointment with a plastic surgeon on January 9, 2012. (*Id.* at 212, 216.)

The same day, Plaintiff submitted to a face-to-face interview with A. Hawkins (Interviewer Hawkins), who opined that he had difficulties seeing, but no difficulties with his ability to hear, read, breathe, understand, be coherent, concentrate, talk, answer, sit, stand, walk, use his hands, and write. (*Id.* at 208-10.) He noted that Plaintiff brought no medical evidence to the interview. (*Id.* at 209.)

On November 18, 2011, a sequential vocational guide was completed by Esperanza Florendo (Vocational Consultant), who found that Plaintiff could perform past relevant work as a maintenance worker as he performed it. (*Id.* at 219.) She also found he was limited to a "wide"

range, in between a full range and a restricted range, of light work. (*Id.*)

On December 7, 2011, SAMC Laurence Ligon, M.D., completed a physical RFC assessment based on a review of Plaintiff's record. (*Id.* at 316-323.) He noted that Plaintiff's primary diagnosis was degenerative joint disease of the right knee. (*Id.* at 316.) He opined that Plaintiff had the "exertional limitations" to occasionally lift and/or carry 20 pounds, frequently lift and/carry 10 pounds, stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday, sit with normal breaks for about 6 hours in an 8-hour workday, and push and/or pull without limitation, including operation of hand and/or foot controls, other than as shown for lift and/or carry. (*Id.* at 317.) He also opined that Plaintiff could frequently balance and stoop, occasionally crawl, crouch, kneel, and climb ramp/stairs, and never climb ladder/rope/scaffolds due to knee pain, with no manipulative, visual, communicative, or environmental limitations. (*Id.* at 318-20.) He expressly found there was no medical source statement to support Plaintiff's physical capacities and that his alleged "functional limitations" were not fully supported by the evidence of record. (*Id.* at 321-22.) He considered the medical evidence relating to Plaintiff's right knee prior to his date last insured, including an October 2007 x-ray, two October 2007 physical examinations, and a November 2008 physical examination. (*Id.* at 323.)

On February 19, 2020, Internist wrote a "To Whom It May Concern" letter that stated in its entirety:

> I am the primary care physician for [Plaintiff].
>
> [Plaintiff] has history of internal knee derangement and right-sided Severe tricompartmental degenerative changes in his knee joint, left knee arthritis limiting his ability to perform his duties at work, preventing him from sitting/standing/walking for prolong period of times. He informs that he has not worked since 2003.

(*Id.* at 326.) A header at the top of the letter read in capital letters: "NOTE DATED: 02/19/2020

… VISIT: 12/26/2019". (*Id.*)[15] Her letter did not attach any explanatory notes or supporting objective tests and did not offer a function-by-function analysis.

On June 24, 2021, Plaintiff submitted to the Appeals Council an undated document entitled "Interrogatories for Arthritis/Knee Problems" signed by LaTamira Dean, BSN, RN (Nurse). (*Id.* at 32.) A definition of ambulation[16] was followed by the following questions and answers:

1. According to the [definition], is this patient able to ambulate effectively? *No.*
2. Does this patient require the use of an assistive device for safe ambulation? *Yes.*
   a. If yes, is the assistive device used for balance? *Yes.*
3. How long was patient required use of assistance device? *13 years*

(*Id.*) (emphasis added). Her note did not attach any explanatory notes or supporting objective tests.

## C.  April 29, 2021 Hearing

On April 29, 2021, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 36-54.) Plaintiff was represented by an attorney. (*Id.*)

### 1.  *Plaintiff's Testimony*

Plaintiff testified that he was 61 years old, weighed about 225 pounds, and was 5 feet 6 inches tall. (*Id.* at 41.) He lived with his common law wife and had completed the twelfth grade. (*Id.*) He last worked in 2002, when he resigned from the post office because his right knee had

---

[15] The ALJ's decision was dated May 25, 2021. (doc. 14-1 at 15-22.)

[16] The document stated that "Social Security defines effective ambulation as follows"

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pane with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

(doc. 14-1 at 32.)

started to bother him, and he had other issues. (*Id.* at 41-42.)

Plaintiff explained that his knee issues prevented him from bending, and his left knee also began bothering him. (*Id.* at 42.) Due to issues with both knees, he could stand for only a certain amount of time, walked with a limp, and was "uncomfortable being out working". (*Id.*) He used a knee brace and a cane prescribed by the VA in 2007. (*Id.*)

On cross-examination, Plaintiff testified that he had undergone three different surgeries in 1981 and 1982 on his right knee due to a "military injury", for which he received a medical discharge; he was unable to re-enlist. (*Id.* at 43.) Due to right and left knee injuries, which were both service connected, he had an overall 70 percent rating at the time. (*Id.* at 43-44.)

After his discharge, he worked in the post office's maintenance department, which was set aside for disabled veterans and accommodated their injuries, including allowing them to sit down whenever necessary, take extra breaks throughout the day, and leave early. (*Id.* at 44.)

Since 2008, Plaintiff had "considerable" pain after standing or walking for 45 minutes, although it sometimes varied, and he needed to sit after only 20 minutes. (*Id.* at 44-45.) He "mostly" stayed home and did not do "too much" because he was "more comfortable" lying down or with his leg elevated. (*Id.*) In the mornings, Plaintiff used a cane to get around and balance himself. (*Id.* at 45.) He sometimes needed a couple of minutes to move his right leg and start walking. (*Id.*) If he walked for 30 minutes, he would probably have to sit anywhere from 10 to 40 minutes, depending on how "bad[ly]" he was "aching". (*Id.*) He could not walk "a long distance" and could not run at all. (*Id.*)

Plaintiff indicated that he could sit for maybe 20 to 30 minutes, and because he could not bend his knee "all the way" and only "so far", he would need to stand or stretch it out in a sitting position. (*Id.* at 46.) Sometimes he would feel relief simply by standing "for a minute" to get the

14

blood flowing and for him to feel "a lot" better. (*Id.*) He kept his cane nearby for when he needed to stand. (*Id.*) He mostly used the cane for his right knee, but sometimes he needed assistance for his left knee because it would start to hurt "bad" and give him "real bad" problems. (*Id.*)

Plaintiff "hardly ever" went out, except for maybe one or two days a week. (*Id.* at 47.) He paid his bills by phone. (*Id.*) If he had personal business to take care of, which was mostly at the VA, he wore braces on both knees. (*Id.*) Three or four days a week, or 12 or 15 days a month, he could not get out of bed due to knee pain, and he stayed in bed all day. (*Id.* at 47-48.) Other weeks he might be able to get out of bed every day, so it varied. (*Id.*)

### 2. *VE's Testimony*

The VE testified that he was familiar with the Social Security Administration's (SSA) definitions of unskilled, semi-skilled, skilled, sedentary, light, medium, heavy, and very heavy work. (*Id.* at 49.) He was familiar with the Dictionary of Occupational Titles (DOT) and its companion publication, Selected Characteristics of Occupations (SCO). (*Id.*)[17]

The VE considered a first hypothetical individual who had Plaintiff's age, education, and work experience and who could perform work at all exertional levels as defined by the regulations limited to the following: occasionally push or pull or operate foot controls with the right lower extremities; occasionally kneel, crouch, skip, balance, crawl, and climb stairs and ramps, but never climb ladders, ropes, and scaffolds; never be exposed to unprotected heights and moving mechanical parts; and have occasional exposure to vibration. (*Id.* at 49-50.) The hypothetical individual could perform light exertional jobs, including electronics worker (DOT 726.687.010,

---

[17] The ALJ found that Plaintiff had no past work. (doc. 14-1 at 49.) Plaintiff's attorney did not object to that finding. (*Id.*)

SVP-2)[18], with 70,000 jobs nationally; office helper (DOT 239.567-010, SVP-2), with 250,000 jobs nationally; and production assembler (DOT 706.687-010, SVP-2), with 200,000 jobs nationally. (*Id.* at 50.) These jobs were consistent with the DOT and SCO. (*Id.* at 51.)

The VE considered a second hypothetical individual with the same RFC as the first individual, but who was allowed to stand for up to 5 minutes after every 10 minutes of sitting and to sit for up to 5 minutes after 10 minutes of standing while remaining on task, and who required a cane to ambulate. (*Id.*) The hypothetical individual could perform sedentary jobs, including table worker (DOT 739.687-182, SVP-2), with 40,000 jobs nationally; final assembler (DOT 713.687-018, SVP-2), with 65,000 jobs nationally; and semi-conductor bonder (DOT 726.685-066, SVP-2), with 38,000 jobs nationally. (*Id.*) The VE noted that neither the DOT nor the SCO recognized a sit/stand option in performing work, so his answers were based on a review of the current literature that provided jobs and answers to hypotheticals regarding a sit/stand option. (*Id.* at 51-52.) He had reduced the number of jobs normally available for these jobs by 25 percent due to erosion.[19] (*Id.* at 52.) Based on his 35 years of experience doing job analyses, placement, and labor market surveys, he agreed with the literature and the available number of jobs. (*Id.*)

The VE also noted that use of a cane for ambulation did not affect these jobs because they were sedentary. (*Id.*) It only affected work that was at least at the light exertional level or if the individual was using the cane to balance. (*Id.*) If it was used to balance, all forms of work would be precluded because an individual who was balancing and standing became a one-armed individual. (*Id.*) The VE noted that he had based his opinion on his education and experience, and

---

[18] SVP stands for Specific Vocation Preparation.

[19] Erosion occurs when the reduction of an individual's exertional or non-exertional capacity limits the ability to perform the full range of sedentary work; the occupational base will be "eroded" by the individual's additional limitations or restrictions. *See* Social Security Ruling (SSR) 96-9p, 1996 WL 374180 (S.S.A. July 2, 1996).

that it was "not noted anywhere" that he knew of specifically. (*Id.*)

The VE considered a third hypothetical individual who had Plaintiff's age, education, and work experience, and the same RFC as the first and second individuals, but who would be absent from work 2 or more days per month and off task 20 percent of the workday. (*Id.*) There would be no jobs for this hypothetical individual. (*Id.*) Neither absenteeism nor being off task were discussed in the DOT or SCO, but current literature indicated that absenteeism was allowed one day per month, and that the average individual was off task 10 percent of any given workday, "approximately 15 minutes"; competitive employment could not be sustained beyond those limits. (*Id.* at 52-53.) His testimony was consistent with the DOT and SCO, with the specific exceptions noted. (*Id.*)

## D.  **ALJ's Findings**

The ALJ issued an unfavorable decision on May 25, 2021. (*Id.* at 22.) At step one, he found that Plaintiff had met the insured status requirements through December 31, 2008, and he had not engaged in substantial gainful activity since the alleged onset date of October 1, 2017. (*Id.* at 17.) At step two, he found the severe impairments of degenerative disc disease of the right knee and obesity; he found no non-severe impairments. (*Id.*) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 18.) He explicitly considered Listing 1.18 regarding abnormality of a major joint in any extremity. (*Id.*)

Next, the ALJ determined that Plaintiff had the RFC to perform a "full range of work at all exertional levels" with the following "nonexertional limitations":

> [He] must be allowed to stand up to 5 minutes after every 30 minutes of sitting, and to sit down up to 5 minutes after every 30 minutes of standing, while remaining on task. [He] can occasionally push or pull or operate foot controls with the right lower extremity. [He] can occasionally kneel, crouch, stoop, balance, and crawl, and can occasionally climb stairs

17

and ramps. [He] requires a cane to ambulate. [He] can never climb ladders, ropes and scaffolds, and can never be exposed to unprotected heights and moving mechanical parts. [He] can tolerate occasional exposure to vibration. [He] requires a cane to ambulate.

(*Id.* at 18). At step four, he found that Plaintiff had no past relevant work. (*Id.* at 21.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from his alleged onset date of October 1, 2008, through the date of his decision. (*Id.* at 22.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court

may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant

satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff did not specifically identify any issues for review, but he relies on a 2-page memorandum from counsel in support of his appeal to the Appeals Council. (doc. 19 at 1-3.) It is liberally construed as raising the following issues:

1. The medical evidence met Listings 1.17 and 1.18.

2. The ALJ's RFC determination that Plaintiff could perform a full range of work at all exertional levels is not supported by medical evidence.

(*Id.*)[20] The Commissioner's brief also construes the filing as raising these issues. (doc. 23 at 1).

### A.  **Listings**

If, as in this case, a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, the ALJ must determine at step three whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations. *Compton v. Astrue*, No. 3:09-CV-051513-B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. § 404.1520). The listed impairments in the Social Security regulations "are descriptions of various physical and mental illnesses ... most of which are categorized by the body

---

[20] *Pro se* briefs are liberally construed and interpreted under less stringent standards than the case of a counseled party. *See Harris v. Barnhart*, 204 F. App'x 447, 448 (5th Cir. 2006) (citing *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995)).

system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Id.* at 530. If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends, and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d).

"Listings criteria are 'demanding and stringent.'" *Lewis v. Barnhart*, 431 F. Supp. 2d 657, 661 (E.D. Tex. Apr. 4, 2006) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). The claimant bears the burden of proving that his impairments meet or equal the criteria found within the listings. *Henson v. Barnhart*, 373 F. Supp. 2d 674, 685 (E.D. Tex. Apr. 29, 2005) (citing *McCuller v. Barnhart*, 72 F. App'x 155, 158 (5th Cir. 2003)); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment; an impairment cannot meet a Listing based only on a diagnosis. 20 C.F.R. § 404.1525(d). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530; *see also Russo v. Saul*, 805 Fed. App'x 269, 273 (5th Cir. 2020). To equal a listing, an unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531 (emphasis in original and footnote omitted); *see* 20 C.F.R. § 404.1526(b)(2). "When a claimant fails to sustain that burden, courts must conclude that substantial evidence supports the ALJ's finding that Listings-level impairments are not present." *Lewis*, 431 F. Supp. 2d at 661 (citations omitted). "[A] claimant may not establish Listings level severity through subjective testimony." *Lewis*, 431 F. Supp. 2d at 661 (citation omitted).

"[T]he responsibility for deciding medical equivalence rests with the [ALJ]." 20 C.F.R.

§ 416.1526(e). The ALJ is to consider all evidence that is relevant to the claimant's impairments and their effects, but must not consider vocational factors such as age, education, and work experience. 20 C.F.R. § 404.1526(c); *see Sullivan*, 493 U.S. at 531-32 (explaining that the overall functional impact of the claimant's unlisted impairment or combination of impairments cannot be used to justify the determination of equivalence of a listed impairment).

### *1.  Listing 1.18*

Listing 1.18 considers musculoskeletal disorders that produce anatomical abnormalities of any major joints in the upper or lower extremities; it requires all the following:

A.  Chronic joint pain or stiffness.
B.  Abnormal motion, instability, or immobility of the affected joint(s).
C.  Anatomical abnormality of the affected joint(s) noted on:
    1.  Physical examination …; or
    2.  Imaging ….
D.  Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:
    1.  A documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; or
    2.  An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or
    3.  An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

20 C.F.R. pt. 404, subpt. P, app.1, §§ 1.00(I)(1), 1.18 (internal cross-references omitted).[21]

These functional limitations *either directly* represent upper extremity limitations, as with the criteria for an inability to perform fine and gross movements, *or indirectly* represent upper extremity limitations, as with the criteria for the use of a hand-held assistive

---

[21] A "documented medical need" means that there is evidence from a medical source that supports a claimant's medical need for an assistive device for a continuous period of at least 12 months." 20 C.F.R. pt. 404, subpt. P, app.1, § 1.00(C)(6)(a). The evidence need not include a specific prescription for the assistive device, but it must describe any limitations in the claimant's upper or lower extremity functioning and the circumstances for which the assistive device is needed. *Id.*

device(s), which necessarily limits the use of the upper extremity holding the assistive device.

*Revised Medical Criteria for Evaluating Musculoskeletal Disorders [Revised Medical Criteria]*, 85 Fed. Reg. 78164, 2020 WL 7056412 (Dec. 3, 2020), www.govinfo.gov/content/pkg/FR-2020-12-03/pdf/2020-25250.pdf (emphasis added).[22] "[F]ine movements" involve the use of one's wrists, hands, and fingers, to pick, pinch, manipulate, and finger, while "gross movements" involve the use of one's shoulders, upper arms, forearms, and hands to handle, grip, grasp, hold, turn, reach, as well as lift, carry, push, and pull. 20 C.F.R. pt. 404, subpt. P, app.1, § 1.18(E)(4). Consideration of any "hand-held assistive devices"[23] requires evidence from a medical source describing any limitations in the upper or lower extremity functioning and the "circumstances" under which the assistive device is needed. 20 C.F.R. pt. 404, subpt. P, app.1, § 1.00(C)(6)(a)).

Here, the ALJ specifically found that the "severity of [Plaintiff]'s physical impairments, considered singly and in combination, did not meet or medically equal the criteria of any impairment listed in 1.18." (doc. 14-1 at 18.) He specifically considered paragraph D and the three alternatives for showing impairment-related physical limitations of musculoskeletal functioning. (*Id.*) Plaintiff points to no medical evidence that establishes a documented medical need for "a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands" under subpart (D)(1). (*See* docs. 3, 19); 20 C.F.R. pt. 404, subpt. P, app.1, § 1.18(D)(1). Because he presents no medical evidence that he used, much less had a medical need

---

[22] The SSA has clarified that an "inability to walk" is not required in determining any functional limitation because the "point of consideration" is not the "relative assistance in walking offered by different assistive devices." (*Id.*)

[23] These Listings provide that "hand-held assistive devices" include walkers, canes, or crutches, which are held onto with hand(s) to support or aid in walking. 20 C.F.R. pt. 404, subpt. P, app.1, § 1.18(C)(6)(d); *see Revised Medical Criteria*, 85/233 Fed. Reg. at 78168 (clarifying that hand-held devices are held onto, not carried, with one's hands).

for, any of the devices under subpart (D)(1), he cannot meet paragraph D criteria on this basis. *See Sullivan*, 493 U.S. at 531; 20 C.F.R. § 404.1526(b)(2). As for subparts (D)(2) and (D)(3), there also is no medical or other evidence to show that Plaintiff was unable to use one or both upper extremities to perform fine and gross movements, as required by both subparts, so he cannot meet the paragraph D criteria on these bases either. Moreover, because he "did not list the criteria for Listing[] … 1.18", "explain how he meets any of the criteria for those listings", or "cite to any evidence in the record that is relevant to a listing", he failed to satisfy his burden. *Aymond v. Comm'r of Soc. Sec. Admin.*, No. 6:21-CV-01161, 2022 WL 486285, at *7 (W.D. La. Feb. 1, 2022), *report and recommendation adopted sub nom. Aymond v. US Comm'r of Soc. Sec.*, No. 6:21-CV-01161, 2022 WL 479528 (W.D. La. Feb. 16, 2022).

Because the ALJ considered the medical evidence and explained his conclusions and determinations at step three, and Plaintiff has not shown a documented medical need for any of the identified devices or an inability to perform fine or gross movements, the ALJ did not commit legal error. *See Washington v. Barnhart*, 413 F. Supp. 2d 784, 795 (E.D. Tex. Jan. 6, 2006) (finding that the evidentiary record failed to disclose a basis for finding Listing 1.03[24] level severity for the plaintiff's severe impairments, so substantial evidence supported the Commissioner's Step 3 finding); *see also Buxton v. Comm'r of Soc. Sec.*, No. 2:21-CV-1-TBM-RPM, 2022 WL 4229325, at *3 (S.D. Miss. Aug. 5, 2022) (finding that the ALJ did not err in concluding that plaintiff did not meet Listing 1.18).

---

[24] After the SSA revised the listings for evaluating musculoskeletal disorders, effective April 2, 2021, Listing 1.02 became Listing 1.18, and Listing 1.03 became Listing 1.17. *See Groff v. Kijakazi*, No. 20-CV-06040-RAL, 2022 WL 17083647, at *4 (E.D. Pa. Nov. 17, 2022) (quoting *Charles K. v. Kijakazi*, 2022 WL 855008, at *4 n.3 (S.D. Ind. Mar. 22, 2022) (citing *Revised Medical Criteria for Evaluating Musculoskeletal Disorders*, 85 Fed. Reg. 78164, 2020 WL 7056412 (Dec. 3, 2020)).

### 2. *Listing 1.17*

Listing 1.17 involves surgery of a major weight-bearing joint and requires meeting all the following:

> A. History of reconstructive surgery or surgical arthrodesis of a major weight-bearing joint.
> B. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months.
> C. A *documented medical need* for *a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands*.

20 C.F.R. pt. 404, subpt. P, app.1, § 1.17 (emphasis added and internal cross-references omitted). Listing 1.17 requires that acceptable medical sources document any surgical procedures and associated medical treatments to restore function of, or eliminate motion in, the affected major weight-bearing joint, such as the knee. 20 C.F.R. pt. 404, subpt. P, app.1, § 1.00(H)(1)-(2).

Here, the ALJ did not discuss Listing 1.17. (doc. 14-1 at 18.) Plaintiff has not shown that this was error, much less "harmful error." (doc. 23 at 4.) He "clearly did not qualify under [Listing 1.17] because it requires a [documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands]," which is not evidenced in the record, as already noted in the discussion of Listing 1.18. *Washington*, 413 F. Supp. 2d at 794 n.9. Even "if [P]laintiff were to meet the Listings at all, he would have to qualify under [Listing 1.18], which [the] ALJ … addressed." *Id.* (applying former Listing 1.02).

Because the record fails to support a basis for finding Listings level severity for his knee impairment, and he has not raised any other basis for meeting any other Listing, Plaintiff failed to carry his burden of proof. *Washington*, 413 F. Supp. 2d at 795. "In that circumstance, the court must conclude that substantial evidence supports the Commissioner's Step 3 finding." *Id.*; *see Selders*, 914 F.2d at 620. There is no basis for concluding that the ALJ's finding that none of Plaintiff's impairments meets or equals Listings level severity is unsupported by substantial

evidence. *Washington*, 413 F. Supp. 2d at 795.

## B.  RFC Determination

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. As noted, the ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco*, 27 F.3d at 163-64. A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and

requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after "careful consideration" of the entire record and making a credibility finding regarding his alleged symptoms and limitations, the ALJ determined that Plaintiff had the RFC to perform a "full range of work at all exertional levels" with the following nonexertional limitations:

> [He] must be allowed to stand up to 5 minutes after every 30 minutes of sitting, and to sit … up to 5 minutes after every 30 minutes of standing, while remaining on task. [He] can occasionally push or pull or operate foot controls with the right lower extremity. [He] can occasionally kneel, crouch, stoop, balance, and crawl, and can occasionally climb stairs and ramps. [He] requires a cane to ambulate. [He] can never climb ladders, ropes and scaffolds, and can never be exposed to unprotected heights and moving mechanical parts. [He] can tolerate occasional exposure to vibration ….

(*Id.* at 18.)

### 1.  *Work at All Exertional Levels*

Plaintiff first argues that the ALJ's RFC determination that he could "perform a full range of work at all exertional levels" is not supported by "medical evidence". (doc. 19 at 3.)

The ALJ specifically stated that he based the RFC on "all the evidence" with consideration of the limitations and restrictions imposed by the combined effects of all of Plaintiff's medically determinable impairments of degenerative joint disease and obesity. (doc. 14-1 at 17-18.) He first noted that the medical evidence established a "history" of degenerative joint disease of the right knee. (*Id.* at 19.) He relied on VA treatment notes showing that Plaintiff had reported injuring his

knee and undergoing surgery in 1981 and 1982. (*Id.* (citing *id.* at 272.)) He also relied on a November 2008 joint evaluation showing that Plaintiff had begun wearing a knee brace and had reported right knee pain and stiffness, and October 2007 imaging studies diagnosing Plaintiff with right-sided degenerative joint disease with status post ACL repair. (*Id.* (citing *id.* at 261, 272, 274)). The ALJ pointed to Examiner's findings that Plaintiff demonstrated a limping gait and pain throughout his range of motion in the right knee with medial jointline tenderness and synovitis but had no incoordination, fatigue, weakness, or lack of endurance in his knee function. (*Id.* (citing *id.* at 273.)) He also pointed to medical records affirming the diagnoses of degenerative joint disease in the right knee. (*Id.* at 19-20 (citing *id.* at 259, 307, 309.)) The ALJ concluded that other than "notations" after the date last insured that indicated Plaintiff pursued aquatic therapy and was prescribed anti-inflammatory medication, there was no further discussion within the relevant period of treatment or symptoms regarding his knee impairment. (*Id.* at 19-20 (citing *id.* at 259, 307, 309.))

The ALJ also considered an October 2007 physical examination diagnosing Plaintiff with right knee orthopedic symptoms and assessing him with "off/on" left foot pain but noting that there was no injury. (*Id.* (citing *id.* at 261.)) He next pointed to a November 2008 joint evaluation, which indicated Plaintiff had tenderness all the way around his knee but no fluid, crepitus, or laxity; he had worn a knee brace over the prior year, had pain on motion, and was diagnosed with degenerative joint disease of the right knee with status post ACL repair in 1981 and 1982, which presented with knee pain and severe disability with progression. (*Id.* (citing *id.* at 272.)) He also pointed to October 2007 imaging revealing chondrocalcinosis, minimal to moderate tricompartmental degenerative joint disease, minimal to moderate narrowing of the medial joint compartment, and small effusion in the knee joint. (*Id.* (citing *id.* at 274.)) He further pointed to

Orthopedist's September 2009 consultation, indicating that Plaintiff reported "bone on bone" pain, wore a knee brace but ambulated without a cane or assistive device, and had not had "much" conservative treatment in terms of physical therapy or injections. (*Id.* (citing *id.* at 307.)) Finally, he considered Internist's August 2009 physical examination, which found no edema in Plaintiff's extremities, "normal strength" in his left upper arm, and zero pain; it diagnosed him with right knee ligament reconstructions with degenerative joint disease and prescribed aquatic therapy and etodolac as needed. (*Id.* (citing *id.* at 309.)) The ALJ expressly cited this medical evidence in determining that Plaintiff required a sit/stand option and a cane to ambulate. (*Id.* (citing *id.* at 261, 272, 274, 307, 309.)) The ALJ took care to explain with references to the record the bases for his RFC determination, and the record supports it.

Moreover, Plaintiff takes no issue with the evidence on which the ALJ relies, cites no evidence that the ALJ failed to consider in determining he had no exertional levels, and offers no argument explaining how any impairment would change the ALJ's RFC determination. (doc. 19 at 2-3); *see Hames v. Heckler*, 707 F.2d 162, 165-66 (5th Cir. 1983) ("The mere presence of some impairment is not disabling per se."). The medical evidence instead shows that the ALJ's decision was based on objective medical evidence, and his decision shows he provided a reasoned analysis in support of his RFC finding that Plaintiff had no exertional limitations. (doc. 14-1 at 17-22); *see Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (finding that the Commissioner need only include limitations in the RFC determination that are supported by the evidence in the record).

Because no information in the record indicates that any exertional limitation existed, substantial evidence supports the ALJ's finding that Plaintiff could perform work at all exertional levels. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).

## 2. *Sedentary Work*

Plaintiff also contends that he could not perform sedentary work because it requires "some walking and standing to carry out job duties". (doc. 19 at 3.) He cites medical evidence of his knee impairment and opinion evidence alleging issues with walking, standing, and sitting. (*Id.*) He essentially argues that the ALJ erred in failing to assess any or greater walking, standing, and sitting limitations based on the evidence in the record. (*Id.*)

As noted, after "careful consideration of the entire record", including the objective medical evidence, all medical evidence, and subjective statements by Plaintiff and third parties, the ALJ found that he had no exertional limitations, except he could perform some postural limitations to varying degrees and needed to avoid others, had limited manipulative use of the lower extremities, and required a sit/stand option and a cane. (doc. 14-1 at 18.) Later in his decision, he explained that Plaintiff's ability to perform work at all exertional levels was "compromised" by nonexertional limitations. (*Id.* at 20.) Relying exclusively on the VE's testimony, the ALJ determined that Plaintiff could perform three jobs classified at the sedentary exertional level. (*Id.* at 18-22.)

Plaintiff first relies on VA treatment records before and after his date last insured to show that he continued to have issues after two knee surgeries. (doc. 19 at 3.) He claims that the evidence shows that he reported joint pain and stiffness with "signs" of limited range of motion, had worn a knee brace since 2007, had mobility and gait issues (e.g., a limping gait), was assessed with trauma that had progressed into a Pellegrini-Stieda lesion, and was diagnosed with right knee degenerative joint disease. (*Id.* (citing doc. 14-1 at 253, 271-73, 307.)) Plaintiff also points to imaging studies that revealed he had chondrocalcinosis, severe degenerative joint disease, and effusion, and that treating physicians "determined" that his knee condition was a "severe" disability, preventing him from standing more than 45 minutes. (*Id.* (citing doc. 14-1 at 271.)) The

ALJ did consider all these medical records, however, even if he did not list every finding within each record that Plaintiff identified. (doc. 14-1 at 19-20 (citing *id.* at 261, 272-74)); *see Falco*, 27 F.3d at 163-64. Relying on these same records, the ALJ also found that "there was no incoordination fatigue, weakness, or lack of endurance noted in his knee function", and that other than medication treatment and aquatic therapy, there was "no further discussion" of treatment or symptoms regarding his knee impairment within the relevant period. (*Id.* at 19 (citing *id.* at 259, 273, 307, 309)); *see Leggett*, 67 F.3d at 564.

Next, Plaintiff points to Internist's letter, which shows that an "[e]xamination noted problems sitting, standing and walking." (doc. 19 at 3 (citing doc. 14-1 at 326.)) The ALJ did consider Internist's February 2020 letter, however. (doc. 14-1 at 20 (citing *id.* at 326.)) As noted, Internist opined that Plaintiff's right-sided severe tricompartmental degenerative changes in his knee joint and left knee arthritis "limit[ed]" his ability to perform work-related activities and "prevent[ed]" him from sitting, standing, and walking for "prolong[ed]" periods of time. (*Id.* (citing *id.* at 326.)) As also noted, Internist's letter did not attach any explanatory notes or supporting objective tests or offer a function-by-function analysis. (*Id.* at 326.) The ALJ expressly found that Internist's letter was "vague" as to the expected period of disability, did not "full[y]" "encompass" the relevant period, and was not supported by the evidence. (*Id.* at 20 (citing *id.* at 326.)) Additionally, the record shows that although Internist's letter related to a visit from December 2019, there was no medical record from that period, and Plaintiff points to none. (*Compare id.* at 326, *with id.* at 253-322.) Instead, the record shows that Internist last examined Plaintiff in March 2011, and last signed one of his treatment notes in June 2011, more than 7 years before the letter is dated. (*Compare id.* at 326, *with id.* at 267, 276-79.) As noted, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Newton*,

209 F.3d at 455. The ALJ was entitled to reject Internist's opinions if he found that it was not supported by the record. *See Taylor v. Apfel*, 228 F.3d 409, 2000 WL 1056273, at *1 (5th Cir. 2000) (finding an ALJ may reject the opinion of any physician, including treating physicians, if not supported by the record). Furthermore, the ALJ's findings that Plaintiff required a sit/stand option, limited manipulative use of his lower extremities, and a cane, and that Plaintiff could perform work at a reduced sedentary exertional level, do not conflict with Internist's finding that Plaintiff's "right-sided [s]evere tricompartmental degenerative changes" and left-sided arthritis "limit[ed] his ability to perform his duties at work" and "prevent[ed] him from sitting/standing/walking for prolong[ed] period[s] of times." (*Compare* doc. 14-1 at 18, *with id.* at 326, *and* doc. 19 at 3); *see Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (finding that "the ALJ did not reach any conclusions that conflicted with the doctor's evaluation").

Lastly, Plaintiff points to Interviewer Haas's note that he "witnessed him limping". (doc. 19 at 3 (citing doc. 14-1 at 189-91.)) As noted, following a face-to-face interview in July 2011, Interviewer Haas found Plaintiff had no difficulties with his ability to hear, read, breathe, understand, be coherent, concentrate, talk, answer, sit, stand, see, use his hands, and write, but he did have difficulties in walking and walked "with a very slight limp". (doc. 14-1 at 189-91.) The ALJ did not discuss Interviewer Haas's evaluation. (*Id.* at 15-22.) Nevertheless, his RFC decision can be supported by substantial evidence even if he did not specifically discuss all the evidence that supported his decision or all the evidence that he rejected. *See Falco*, 27 F.3d at 164. Additionally, Interviewer Haas's interview occurred three and a half years after Plaintiff's date last insured. (doc. 14-1 at 189-91.) Furthermore, while Interviewer Haas opined that Plaintiff had no difficulty sitting or standing, the ALJ found that Plaintiff required a cane to ambulate and a sit/stand option, limiting him to no more than 30 minutes of sitting or standing. (*Compare id.* at

18, *with id.* at 189-91.)

In conclusion, in determining Plaintiff's RFC, the ALJ relied on the same medical records that Plaintiff cited, he explained the bases for his RFC determination, and the record supports his RFC determination. (*Id.* (citing *id.* at 261, 272, 307.)) Although Plaintiff argues that the ALJ erred in failing to assess any or greater walking, standing, and sitting limitations in his RFC determination, he does not object to the evidence discussed by the ALJ and offers no argument explaining how his knee impairment prevented him walking, standing, or sitting as required by a reduced sedentary exertional level. (*Compare* doc. 19 at 3, *with* doc. 14-1 at 17-21); *Maharajh v. Barnhart*, 424 F. Supp. 2d 915, 937 (S.D. Tex. Jan. 5, 2006) (rejecting plaintiff's argument that he could not perform sedentary work with the required use of a cane and an inability to stoop). Substantial evidence supports the ALJ's RFC determination that Plaintiff could walk, stand, and walk as required by a reduced sedentary exertional level. *See Greenspan*, 38 F.3d at 236.

### *3. Using a Cane for Balance*

Plaintiff further contends that using one hand for balance "render[s] [him] unable to perform standing tasks and utilize both hands." (doc. 19 at 3) (internal quotation marks omitted). Earlier in his brief, he references the VE's testimony at the hearing before the ALJ that using a cane to balance precluded all work. (*Id.* at 2.) He essentially argues that the ALJ failed to adequately address the impact that his use of a cane for the purpose of balancing himself has on his ability to use both hands to work while standing. (*Id.* at 2-3.)

As noted, the ALJ found that Plaintiff had the RFC to perform work at all exertional levels but was limited in manipulative use of his lower extremities and required a sit/stand option and a cane "to ambulate." (doc. 14-1 at 18.) In finding that Plaintiff required a cane to ambulate, the ALJ specifically considered an October 2007 physical examination that diagnosed him with right knee

orthopedic symptoms and a November 2008 joint evaluation that indicated he had tenderness around his knee but no fluid, crepitus, or laxity. (*Id.* at 20 (citing *id.* at 261, 272.)) He also considered the findings of an October 2007 x-ray revealing chondrocalcinosis, minimal to moderate tricompartmental degenerative joint disease, minimal to moderate narrowing of the medial joint compartment, and small effusion in the knee joint. (*Id.* (citing *id.* at 274.)) He also considered Internist's August 2009 physical examination and Orthopedist's September 2009 consultation, noting Plaintiff's "bone on bone" pain, use of a knee brace but ambulating without a cane or assistive device, and/or his anti-inflammatory prescription and aquatic therapy referral. (*Id.* (citing *id.* at 309.)) The ALJ expressly found that this evidence indicated Plaintiff's right knee degenerative joint disease with pain on motion, and that it supported the use of a cane. (*Id.* (citing *id.* at 261, 272, 274, 307, 309.))

Other than a brief and vague reference to Plaintiff's "decreased gait/transfer/balance" in a July 2011 aquatic therapy assessment, (*id.* at 276), there is no medical record that indicates that he complained to a physician of issues with balance or was prescribed or relied on a cane to balance himself, (*id.* at 253-326). Notably, the first time the record shows that he reported using a cane, that it was prescribed to him, and that he used it to walk and to balance himself in the mornings was the April 2021 hearing with the ALJ. (*Id.* at 42, 45.) The second reference in the record to his use of a cane to balance himself appears in Nurse's June 2021 interrogatories. (*Id.* at 32.) As noted, the interrogatories are undated, lack any reference to the medical evidence of record, are unsupported by any explanations or supporting notes or diagnostic tests, and Plaintiff submitted them as evidence after the hearing and 10 years after filing his claim. (*Id.*) Furthermore, the Appeals Council considered this evidence and determined that it "does not show a reasonable probability that it would change the outcome of the decision." (*Id.* at 5-6.)

Moreover, the medical and opinion evidence consistently indicates that Plaintiff had no issues standing or balancing and did not use a cane. (*Id.* at 189-91, 208-09, 255-56, 273, 317-18.) In October 2007, FNP found that Plaintiff had normal coordination and gait and could "stand/walk" for 6 to 8 hours in a workday, while Examiner found that he had a limping gait on the right but did not wear a brace or use an assistive device and had no incoordination, fatigue, weakness, or lack of endurance on his knee function. (*Id.* at 255-56, 273.) Additionally, SAMC Ligon found that despite other physical limitations, Plaintiff could frequently balance and stand and/or walk about 6 hours in an 8-hour workday in December 2011. (*Id.* at 317-18). Following face-to-face meetings with Plaintiff in July 2011 and November 2011, respectively, Interviewers Haas and Hawkins opined that Plaintiff had no difficulties with standing, although Interviewer Haas did find that Plaintiff had difficulties walking and walked "with a very slight limp". (*Id.* at 189-91, 208-09.) Vocational Consultant opined that Plaintiff could perform a wide range of light work in November 2011. (*Id.* at 219.)

Nothing in the record indicates that Plaintiff used a cane for balance or was unable to use both hands while standing. (doc. 14-1.) Because the disability determination falls within the purview of the ALJ, he was not required to accept Nurse's conclusory statements. *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *see also Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] ... to resolve."). Accordingly, substantial evidence supports the ALJ's RFC determination as to Plaintiff's physical limitations and his use of a cane to ambulate.

## IV.    RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 17th day of February, 2023.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE